UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIAM A. CURRY, ROBERT L. CLAXTON, JOHN R. SULLIVAN, JANICE M. WALKER, THE WALKER FAMILY TRUST, WILLIAM J. KISSEL, AND ROBERT H. LEDBETTER, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>TD AMERITRADE, INC., f/k/a TD Waterhouse Investor Services, Inc.; TD AMERITRADE CLEARING, INC.; TD AMERITRADE HOLDING CORPORATION, f/k/a Ameritrade Holding Corporation, as Successor-in-Interest to TD Waterhouse Group, Inc.; AND CHARLES SCHWAB & CO., INC.<br><br>    Defendants. | Civil Action<br><br>File No. _____<br><br><br><br><br>CLASS ACTION COMPLAINT<br><br><br><br><br>DEMAND FOR JURY TRIAL |

By and through the undersigned counsel, William A. Curry ("Curry");

Robert L. Claxton ("Claxton"); John R. Sullivan ("Sullivan"); Janice M. Walker

("Walker"); the Walker Family Trust, by and through its Trustee, Samuel S.

1

Walker II ("Walker Trust"); William J. Kissel ("Kissel"); and Robert H. Ledbetter ("Ledbetter") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, other than Defendants (as defined herein) and certain other excluded persons and entities as set forth below (the "Class"), respectfully submit this Class Action Complaint against TD Ameritrade, Inc., formerly known as TD Waterhouse Investor Services, Inc.; TD Ameritrade Clearing, Inc.; and TD Ameritrade Holding Corporation, formerly known as Ameritrade Holding Corporation, as successor-in-interest to TD Waterhouse Group, Inc. (collectively, "TD Ameritrade"); and Charles Schwab & Co., Inc. ("Schwab" and collectively with TD Ameritrade, "Defendants").

Plaintiffs hereby allege the following based upon personal knowledge as to the allegations concerning themselves and based upon the investigation of their counsel, which has included, without limitation: (a) review and analysis of certain Securities and Exchange Commission ("SEC") filings, other public statements, and other documents disseminated by or concerning the Defendants named herein and related parties; (b) review and analysis of the filings in *S.E.C. v. Alleca et al.*, Civil Action No. 1:12-CV-03261-WSD (N.D. Ga.) (the "Alleca SEC Complaint"), and *S.E.C. v. Detroit Memorial Partners, LLC et al.*, Civil Action No. 1:13-CV-01817-

WSD (N.D. Ga.) (the "Detroit Memorial SEC Complaint"); (c) in-person and telephone interviews and discussions with the Court-appointed receiver in the former case; (d) review of documents and multiple in-person and telephone interviews with Angelo A. Alleca ("Alleca"); (e) in-person and telephone interviews with former employees of Summit Wealth Management, Inc. ("Summit Wealth"); (f) in-person and telephone interviews with Plaintiffs and other members of the Class; and (g) review and analysis of public documents in similar and related cases.

## I.    NATURE OF THE ACTION

1.    This case concerns the role of TD Ameritrade and Schwab in facilitating a fraudulent scheme perpetrated by Alleca that defrauded approximately 390 investors out of approximately $40.5 million.  This deception was achieved – and could only have been achieved – through Defendants' reckless or intentional lack of oversight and due diligence and through their eschewal of compliance with the duties they owed Plaintiffs and the Class.

2.    TD Ameritrade and Schwab were not innocent participants who were simply duped by Alleca's scheme.  On the contrary, both could – and indeed should – have readily noticed it and taken steps to prevent it.  Despite a multitude

of red flags, however – most of which were highly obvious (and should have been blindingly so to those in the financial industry) – both TD Ameritrade and Schwab ignored the overwhelming evidence of impropriety in order to profit from the vast array of fees they stood to earn from the clients Alleca brought them.  In particular, and as detailed further herein, TD Ameritrade and Schwab either recklessly or intentionally ignored the clear signs of wrongdoing in the SEC filings provided to them by Alleca and Summit Wealth that spelled out a conflict of interest that was at the heart of the fraudulent scheme.

3.      TD Ameritrade and Schwab's failings went further than this, however, as they allowed Alleca himself to provide – without any verification – the valuations of Plaintiffs' the Class's investments.  These valuations were then passed on directly by TD Ameritrade and Schwab – unchecked – to Plaintiffs and the Class, thereby concealing Alleca's wrongdoing from Plaintiffs and the Class.

4.      In 2009, Alleca ended his relationship with Schwab when Schwab refused to allow him to continue providing his own valuations for the assets in one of his funds.  At this point, TD Ameritrade – which served as the broker-dealer custodian to Alleca's other investment funds – readily took over the role and allowed Alleca to continue providing his own asset valuations, all in the search for

greater profits.  Even more staggeringly, when Alleca's scheme came crashing down, TD Ameritrade only disassociated itself from Alleca and Summit Wealth when Alleca refused to allocate $200,000 in trading losses to specific client accounts (and not because of the wrongdoing alleged herein).

5.     Defendants are liable to Plaintiffs and other members of the Class for their role in the unlawful sale of securities and violations of legal, fiduciary, contractual, and ordinary duties owed to Plaintiffs and other members of the Class. As alleged in more detail herein, Defendants materially aided and participated in the sale of securities by means of misleading statements and omissions of material fact necessary in order to make those statements, in light of the circumstances under which they were made, not misleading.  The sales of these securities were made pursuant to a fraudulent scheme by Alleca, whom Defendants directly and indirectly controlled.  Accordingly, Defendants are jointly and severally liable with Alleca for such sales under the securities laws of the United States and the State of Georgia because they will be unable to sustain the burden of proof that they did not know and, in the exercise of reasonable care could not have known, of the underlying misconduct.  By materially aiding and participating in the sale of these securities and by further misrepresenting the integrity of those securities via

personal account statements the Defendants created and sent directly to Plaintiffs and other members of the Class, Defendants also breached legal, fiduciary, contractual, and ordinary duties they owed to Plaintiffs and other members of the Class.   Accordingly, they were also unjustly enriched for promoting and facilitating a fraudulent scheme by virtue of the fees they earned by serving as broker-dealer custodians for Plaintiffs and other members of the Class.

6.     Plaintiffs Curry, Claxton, Sullivan, Walker, the Walker Trust, and Kissel, on behalf of the Class of similarly situated individuals (the "TD Ameritrade Subclass"), bring this action against TD Ameritrade for its involvement with, material aid to, and control over Alleca and his sale of unlawful securities under U.S. and Georgia law, breach of fiduciary duties owed to Plaintiffs and other members of the Class, aiding and abetting Alleca's breach of such duties, breach of contractual and ordinary duties owed to Plaintiffs and the Class, and its associated unjust enrichment.  The relevant securities concern Summit Investment Fund, LP ("Summit Fund"); Asset Class Diversification Fund, LP (the "Asset Class Fund"); Private Credit Opportunities Fund, LLC (the "Private Credit Fund"); and Detroit Memorial Partners LLC ("Detroit Memorial").

7.     Plaintiff Ledbetter, on behalf of the Class of similarly situated individuals (the "Schwab/TD Subclass" and collectively with the TD Ameritrade Subclass, the "Class"), brings this action against Schwab and TD Ameritrade for their involvement with, material aid to, and control over Alleca and his sale of unlawful securities under U.S. and Georgia law, breach of fiduciary duties owed to Plaintiffs and other members of the Class, aiding and abetting Alleca's breach of such duties, their breach of contractual and ordinary duties owed to Plaintiffs and the Class, and their associated unjust enrichment.  The relevant securities concern the Private Credit Fund.

8.     TD Ameritrade and Schwab are industry leaders among providers of broker-dealer custodian services to registered investment advisers and their clients. TD Ameritrade and Schwab are regarded as members of the "Big Four" (along with Fidelity Institutional Wealth Services and Pershing Advisor Solutions LLC) in this sector.   Fierce competitors for the business of registered investment advisers, like Summit Wealth, and their owners, like Alleca, Schwab had (and retains) the largest market share in this sector during the time period alleged herein, while TD Ameritrade was the fastest growing broker-dealer custodian during this same time period.  Defendants served as broker-dealer custodians for

retirement and other brokerage accounts for Plaintiffs and other members of the Class and materially aided, participated, and facilitated the unlawful transactions in securities at issue in this case.

9.     In so doing, Defendants violated state and federal laws as well as their duties to clients, acting despite the presence of multiple, notorious red flags alerting them to Alleca's scheme.  As their broker-dealer custodians, Defendants provided periodic statements to Plaintiffs and other members of the Class, which was the means by which Plaintiffs and other members of the Class verified that they had invested in legitimate securities.  In providing these valuations, Defendants conducted no due diligence; instead, they simply accepted the values Alleca provided for the Summit Fund, the Private Credit Fund, and the Asset Class Fund.

10.     To officially register his various securities (the Summit Fund, the Private Credit Fund, the Asset Class Fund, and Detroit Memorial) with TD Ameritrade, Alleca merely provided copies of the offering memoranda and subscription documents for each security.  Thereafter, TD Ameritrade assigned an internal control number to the fund, and allowed Alleca to offer them to its clients *across the entire brokerage company*.  These internal numbers were then listed on

8

client statements, further misrepresenting the validity of the underlying investments.

11.     Then, once the funds received a TD Ameritrade corporate-approved internal number, TD Ameritrade would again misrepresent the integrity of these funds to Plaintiffs and other members of the Class based solely on Alleca's word as to their value and integrity.  On some occasions, Alleca would send pricing information directly to a particular broker-dealer, and the valuations Alleca provided would be incorporated into Plaintiffs' and other members of the Class's account statements from TD Ameritrade.

12.     Before September 2012, TD Ameritrade did not request any additional information (such as audited financial reports) for any of Alleca's funds or try to verify their integrity.  This was particularly egregious given that two of the offering memoranda listed Alleca as the managing member or the general partner of the funds, which should have resulted in extra scrutiny of the investments.

13.     Ultimately, in 2009, after materially aiding and participating in unlawful purchases of over $1.2 million in Private Credit Fund securities, and collecting the fees that Summit Wealth and Alleca's business brought Schwab, Schwab began to refuse to report the value of the Private Credit Fund securities on

9

the account statements of Plaintiff Ledbetter and other members of the Schwab/TD Subclass. Thereafter, Alleca moved all of these accounts and others – approximately $60 million in total assets under management – from Schwab to TD Ameritrade, who was still willing to appease Alleca by representing the integrity of these securities on account statements sent to Plaintiffs and other members of the Class.

14. Only after years of collecting lucrative fees by serving as the broker-dealer custodian for Plaintiffs and the Class did TD Ameritrade begin efforts to terminate its relationship with Alleca, but for reasons unrelated to the securities at issue in this case. Because Alleca refused to allocate around $200,000 in trading losses to client accounts and had violated a FINRA block-trading rule, on August 8, 2012, TD Ameritrade sent a letter to Summit Wealth declaring the end of the affiliation between the parties, effective 60 days from the date of that letter. By October 8, 2012, the termination date of the letter, the SEC had filed the Alleca SEC Complaint; the Court had appointed a receiver; and Plaintiffs' and the Class members' investments were mostly worthless.

## II.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiffs

15.   Plaintiff Curry is a resident of the State of Georgia.  Acting on his behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $100,000 in Private Credit Fund securities.

16.   Plaintiff Claxton is a resident of the State of Georgia.  Acting on his and his wife's behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $275,000 in total in Private Credit Fund and Detroit Memorial securities.

17.   Plaintiff Sullivan is a resident of the State of Georgia.  Acting on his behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $300,000 in total in Private Credit Fund and Detroit Memorial securities.

18.   Plaintiff Walker is a resident of the State of Virginia.  Acting on her behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $225,000 in total in Private Credit Fund and Detroit Memorial securities.

19.     Plaintiff Walker Trust is a resident of the State of Virginia.  Acting on its behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $850,000 in total in Asset Class Fund, Private Credit Fund, and Detroit Memorial securities.

20.     Plaintiff Kissel is a resident of the State of Georgia.  Acting on his behalf, Defendant TD Ameritrade materially aided and participated in the purchase of approximately $475,000 in total in Summit Fund and Detroit Memorial securities.

21.     Plaintiff Ledbetter is a resident of the State of Alabama.  Acting on his behalf, Defendant Schwab materially aided and participated in the purchase of approximately $25,000 in Private Credit Fund securities.

**B.     Defendants**

22.     Defendant TD Ameritrade, Inc. is a subsidiary of TD Ameritrade Holding Corporation.   TD Ameritrade, Inc. was formerly known as TD Waterhouse Investor Services, Inc.  TD Ameritrade, Inc. provides broker-dealer and other services to its clients and provided such services to Plaintiffs and members of the Class during the relevant time period.  It is incorporated in New York and based in Omaha, Nebraska.

23.    Defendant TD Ameritrade Clearing, Inc. is a subsidiary of TD Ameritrade Holding Corp.  TD Ameritrade Clearing, Inc. provides clearing and execution services to TD Ameritrade, Inc., as well as custodial services to clients, which services were provided to Plaintiffs and other members of the Class.  TD Ameritrade Clearing, Inc. is incorporated in Nebraska and is based in Omaha, Nebraska.

24.    Defendant TD Ameritrade Holding Corporation, formerly known as Ameritrade Holding Corporation, is the successor-in-interest to TD Waterhouse Investor Services, Inc. following the completion of the January 24, 2006 acquisition of TD Waterhouse Group, Inc. ("TD Waterhouse") pursuant to an Agreement of Sale and Purchase, dated June 22, 2005, as amended, with The Toronto-Dominion Bank.  Ameritrade Holding Corporation purchased from The Toronto-Dominion Bank all of the capital stock of TD Waterhouse (the "Share Purchase").  Prior to the consummation of the Share Purchase, TD Waterhouse conducted a reorganization in which it transferred its Canadian retail securities brokerage business and TD Bank USA, N.A. to The Toronto-Dominion Bank such that, at the time of consummation of the Share Purchase, TD Waterhouse retained

13

only its United States retail securities brokerage business, which included TD Waterhouse Investor Services, Inc.

25.     Defendant Charles Schwab & Co., Inc. is an investment banking and securities brokerage firm.  Charles Schwab & Co., Inc. provides broker-dealer and other services to its clients and provided such services to Plaintiff Ledbetter and other members of the Schwab/TD Subclass.  Charles Schwab & Co., Inc. is incorporated in California and is based in San Francisco, California.  Charles Schwab & Co., Inc. operates as a subsidiary of Schwab Holdings, Inc., which is, in turn, a subsidiary of The Charles Schwab Corporation.

### C.     Relevant Non-Parties

26.     Alleca is and has been a resident of Atlanta, Georgia.  He was the founder, President, Chief Operating Officer, and Chief Compliance Officer of Summit Wealth.  Alleca also managed and controlled the Summit Fund, the Private Credit Fund, and the Asset Class Fund, and promoted and sold subscriptions in Detroit Memorial securities.  Alleca, along with Summit Wealth, Summit Fund, the Asset Class Fund, and the Private Credit Fund, are defendants to the Alleca SEC Complaint, currently pending in the United States District Court for the Northern District of Georgia, Atlanta Division.

27.     Summit Wealth was incorporated in Delaware, but has maintained its corporate headquarters in Georgia throughout the relevant period (during which time it was a registered investment adviser with the SEC), most recently at 115 Perimeter Center Place, N.E., Suite 150, Atlanta, Georgia.  At all times relevant to these allegations, Summit Wealth was operated and controlled by Alleca.  At its peak in 2008, Summit Wealth appears to have held more than 2,200 client accounts and managed as much as $1 billion in assets.

28.     Summit Fund was founded as a private Delaware limited partnership in or around 2003/2004.  At all relevant times, Alleca directly managed and controlled Summit Fund, which purportedly operated as a fund-of-funds (i.e., a portfolio of other investment funds rather than investing directly in stocks, bonds, or other securities).   Summit Fund's general partner was Summit Capital Management, Inc., and Summit Fund listed its corporate address and telephone number as Alleca's office address and telephone number in Buffalo, New York.

29.     The Asset Class Fund was founded as a Delaware limited partnership and investment vehicle in or around 2005.  At all relevant times, Alleca directly managed and controlled the Asset Class Fund, which purportedly invested in

15

investment partnerships, managed accounts, and other investment vehicles that invested primarily in securities and other financial instruments.

30.     The Private Credit Fund was founded as a Delaware limited liability corporation and investment vehicle purportedly in November 2008.  At all relevant times, Alleca managed and controlled the Private Credit Fund.  The Private Credit Fund's stated investment objective was to "maximize total return through capital appreciation and interest income from investments in public and private investment grade and non-investment grade debt securities, direct loans, municipal bonds, mortgages, collateralized mortgage obligations (CMO), collateralized debt obligations (CDO), asset backed securities (ABS), bridge lending, equity securities, warrants, options and convertible debt of companies, and other special situation investments."

31.     Detroit Memorial is a Delaware limited liability company and investment vehicle that is the subject of the Detroit Memorial SEC Complaint and associated action.  Detroit Memorial owns a 49% equity interest in Midwest Memorial Group, LLC ("Midwest Memorial"), which owns and operates 28 cemetery properties in Michigan.  The address for Detroit Memorial's "principle

place of business" is the home address of its managing member, Mark Morrow ("Morrow"), in Cincinnati, Ohio.

32.     Morrow is a long-time business associate of Alleca.  Morrow was the managing member of Detroit Memorial (although Alleca in reality managed the assets) and is named as a defendant in the Detroit Memorial SEC Complaint.  He is also the managing member of Vision Advisors, LLC, which is the general partner in the Asset Class Fund.

## III.   JURISDICTION AND VENUE

33.     The claims asserted herein arise under the Georgia Uniform Securities Act; its predecessor, the Georgia Securities Act of 1973; the federal securities laws; as well as state and common law contractual, fiduciary, and ordinary duties.

34.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) (now codified as 28 U.S.C. § 1332). The Class Action Fairness Act provides federal courts with original jurisdiction of any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs.  Plaintiffs allege

that the total claims of the Class Members exceed $5 million in the aggregate, exclusive of interest and costs.

35.   For the purposes of diversity, Plaintiffs Curry, Claxton, Sullivan, and Kissel are citizens of Georgia; Plaintiffs Walker and the Walker Trust are citizens of Virginia; and Plaintiff Ledbetter is a citizen of Alabama.   Additionally, more than two-thirds of all members of the Class are citizens of a state other than Georgia.   Defendant TD Ameritrade, Inc. is a citizen of New York and Nebraska; Defendant TD Ameritrade Clearing, Inc. is a citizen of Nebraska; Defendant TD Ameritrade Holding Corporation is a citizen of Delaware and Nebraska; and Defendant Schwab is a citizen of California.

36.   Venue is proper pursuant to Title 28, United States Code, Section 1391 because Defendants conduct business and may be found in this District and because many of the acts and transactions forming the basis of the claims in this action occurred in substantial part in this District.

## IV.   FACTUAL BACKGROUND

37.   Major portions of both TD Ameritrade's and Schwab's businesses are devoted to providing broker-dealer custodian services to clients, such as Plaintiffs and members of the Class, via registered investment advisers like Summit Wealth,

who are also Defendants' clients in this context.   In fact, Schwab and TD Ameritrade are two of the "Big Four" in this particular financial industry, in which Schwab is the largest in terms of assets under management and TD Ameritrade has been the fastest growing over the last decade.   TD Ameritrade, Schwab, and other broker-dealer custodians make substantial profits and therefore fiercely compete for the business of registered investment advisers, like Summit Wealth, which was one of TD Ameritrade's largest and most important registered investment advisers during the relevant time period.

38.   Summit Wealth and other registered investment advisers provide investment management and financial planning services to clients in return for a fee.   Registered investment advisers are not permitted to hold their clients' accounts directly, but are instead required to use a qualified broker-dealer custodian.   Therefore, registered investment advisers contract with broker-dealers to provide these services.   In such cases, the investor opens a brokerage account with the broker-dealer custodian and signs a contract with his or her registered investment adviser that grants that registered investment adviser authority to make trades on behalf of the investor.   All other account functions are maintained by the broker-dealer custodian.   The registered investment adviser may not withdraw or

deposit funds from and to the investor's account.   Rather, the broker-dealer custodian must do so and, in exchange, receives trading commission fees, account fees, fees paid by mutual funds, and money-market fees, among other things of value, and in return, the broker-dealer undertakes certain responsibilities.   Because of their role in this relationship, the compliance departments of broker-dealer custodians are uniquely positioned to detect instances of fraud, as were Schwab and TD Ameritrade in this instance.

### A.   Summit Wealth and the Summit Fund

39.   Obviously, the bigger the registered investment adviser, the greater the fees, and broker-dealer custodians fiercely compete for the business of registered investment advisers like Alleca's Summit Wealth.   On January 1, 2004, Alleca purchased a registered investment adviser with approximately $40 million in assets under management.   With that purchase, Alleca first became associated with TD Waterhouse (now known as TD Ameritrade), which was serving as the broker-dealer custodian for the registered investment adviser Alleca purchased. Following that purchase, Alleca changed the name of his firm to Summit Wealth and began expanding rapidly.

40.   In early 2004, Alleca also started the Summit Fund, a private fund for which he solicited investments from the clients of Summit Wealth.   Shortly thereafter, TD Waterhouse began materially aiding and participating in the sale of Summit Fund securities, while serving as the broker-dealer custodian for Plaintiff Kissel and other members of the TD Ameritrade Subclass.   During the summer of 2004, TD Waterhouse accepted the Summit Fund onto its platform and assigned it an internal "Security Number."   In so doing, TD Waterhouse represented its acceptance of the security to its investors.   This allowed any client of TD Waterhouse to purchase the security.

41.   The Private Placement Memorandum ("PPM") of the Summit Fund and other communications also misleadingly represented to investors that the fund had a successful track record as a fund-of-funds.   For instance, the Summit Fund's PPM represented that the fund's underlying "Limited Partnership Agreement" had been "Amended and Restated as of September 24, 2003."   However, Alleca omitted the material fact that he had only begun to operate and raise capital for the Summit Fund after acquiring Summit Wealth in 2004.   Similarly, the Summit Fund PPM failed to disclose that Alleca would be managing and handling trading for one of the funds.   TD Waterhouse could have easily uncovered these inconsistencies

had it conducted any due diligence prior to accepting the Summit Fund securities onto its platform and otherwise materially aiding and participating in the sales of its securities.  Instead, by accepting the Summit Fund securities and committing to price and report their value, TD Waterhouse materially contributed to a guise of its integrity.

42.    By approving and maintaining the Summit Fund securities on its platform, TD Waterhouse materially aided and participated in the transactions that followed.  Indeed, the market for these securities could not have existed but for Alleca's misleading statements and omissions as to their integrity and, more importantly, but for TD Waterhouse's acceptance of the securities onto its platform.  In so doing, TD Waterhouse had a duty to undertake appropriate due diligence, any modicum of which would have revealed Alleca's violations of Georgia and federal securities laws.

43.    A glaring red flag on page 10 of the Summit Fund PPM makes TD Waterhouse's utter lack of due diligence into the Summit Fund prior to listing its associated securities on its platform for sale to all of its clients all the more incredible.  On that page, the Summit Fund PPM disclosed to TD Waterhouse that Alleca – undoubtedly one of TD Waterhouse's newest owners of a registered

investment adviser using its services – was managing the Summit Fund while simultaneously soliciting Summit Wealth clients to invest in it:

> The general partner of the Partnership is Summit Capital Management, LLC, (the "General Partner") a Delaware limited liability company.  **The General Partner will be responsible for managing the business of the Partnership.  The managing member of the General Partner is Angelo Alleca (the "Managing Member")**, and he will invest a substantial portion of his net worth in the Partnership.

Summit Fund PPM at 10 (emphasis added).

44.     Indeed, for a sophisticated member of the financial industry like TD Waterhouse, this candid disclosure in the Summit Fund PPM was a huge red flag, so much so that Alleca only dared disclose it once – as discussed in more detail below – on Summit Wealth's required Form ADV[1] filing with the SEC because he knew it would trigger an SEC audit.  By contrast, TD Waterhouse did not ask for a single financial statement or any other documentation before listing it on its platform, assigning it a TD Waterhouse Security Number, offering it for sale across its entire client base, and subsequently reporting specific values for the security on periodic client account statements based solely on Alleca's wholly unsubstantiated word.

---

[1] A Form ADV is a standardized form used by investment advisers to register with both the SEC and state securities authorities.

45.    In fact, had Alleca known that such acquiescence in and assistance with sales of Summit Fund securities was so forthcoming from TD Waterhouse, he would have sought their listing earlier than the summer of 2004.   He simply thought it was not possible that TD Waterhouse would do so.   Had TD Waterhouse not done so, the subsequent eight years would not have unfolded as they did.   And if there still were a Court-appointed receivership styled like the Alleca SEC Complaint, its claimants would number perhaps in the tens, certainly not the hundreds.

46.    By not conducting such due diligence and not disclosing that fact to Plaintiff Kissel and other members of the TD Ameritrade Subclass, TD Waterhouse willfully and materially aided and participated in the sale of securities in violation of Georgia and federal securities laws and breached their duties to Plaintiff Kissel and other members of the TD Ameritrade Subclass.   This omission was material to Alleca's sale of these securities and his overall scheme.

47.    By thereafter effectuating the transactions in the Summit Fund securities, TD Waterhouse provided further material aid and participated in the unlawful sale of Summit Fund securities to Plaintiff Kissel and other members of the Class.   In connection with the sale of these securities, TD Waterhouse, Alleca,

24

the Summit Fund, and Summit Wealth omitted material facts necessary to make statements made, in the light of circumstances under which they were made, not misleading.   In particular, by staying silent, TD Ameritrade, Alleca, Summit Wealth, and the Summit Fund misled investors into believing that the securities were lawfully registered and that TD Waterhouse, prior to accepting the Summit Fund securities and Summit Wealth onto its platform, had conducted (at least a modicum of) due diligence.

48.   According to Alleca, he did not originally intend to  actively trade for one of the funds that was part of the Summit Fund fund-of-funds, but once he did he quickly incurred substantial losses.  Alleca was able to conceal this trading and the associated losses from Plaintiff Kissel and the TD Ameritrade Subclass because TD Waterhouse provided them with misleading periodic statements attesting to the Summit Fund's integrity.  Omitted from these periodic statements was the material fact that TD Waterhouse had simply accepted Alleca's word as to the value of the securities without conducting anything approximating due diligence.  Rather, TD Waterhouse willfully and blindly accepted those values, incorporated them into its statements to Kissel and other members of the TD Ameritrade Subclass, and

reported the same directly to them on TD Ameritrade statements, without even asking for so much as a solitary financial statement or any other documentation.

### B.    The Asset Class Fund

49.    In order to cover the losses incurred in the Summit Fund, Alleca promptly started the Asset Class Fund in or around March 2005 to raise capital from Summit Wealth clients to cover redemptions to the Summit Fund and other Asset Class Fund investors.   Just as promptly and in identical fashion to the Summit Fund, TD Waterhouse approved it for listing on its platform without any more due diligence or modicum of effort to verify that its sale would not violate Georgia and federal securities laws.   Thereafter, TD Waterhouse likewise materially aided and participated in the sale of Asset Class Fund securities to Plaintiff Walker Trust and other members of the TD Ameritrade Subclass.

50.    The Asset Class Fund's PPM stated that it would undertake non-traditional investment strategies through carefully selected and monitored professional investment managers with the goal of establishing returns greater than that of the Standard & Poor's ("S&P") 500 stock index.   These purportedly included investments in undervalued securities, hedging, short selling, distressed

companies, risk arbitrage, convertible securities arbitrage, foreign securities, opportunistic trading, futures, options and other contracts, and leverage.

51.     These and other statements about the Asset Class Fund were misleading because they omitted the material fact that the primary purpose of the capital raised was to pay for investors' redemptions in the Summit Fund and, ultimately, the Asset Class Fund as well, as part of a Ponzi-like scheme wherein Alleca wholly ignored corporate structures and comingled and misappropriated assets.  But for this obviously material omission, no market for these securities would have existed.  Likewise, but for TD Waterhouse's acceptance and maintenance of the securities on its platform, no market for these securities would have existed.  Accordingly, TD Waterhouse materially aided and participated in the unlawful sale of these securities by approving and maintaining them on its platform, which allowed for reporting of the securities on periodic statements and for all other TD Waterhouse clients to invest in them, precisely as it had done with the Summit Funds.

52.     Pursuant to the Asset Class Fund PPM and other misleading communications that similarly omitted material facts, Alleca raised capital for the Asset Class Fund with TD Waterhouse's material aid and participation in Alleca's

sales of Asset Class Fund securities.  Not knowing that the Asset Class Fund was part of a Ponzi scheme orchestrated by Alleca or that TD Waterhouse's acceptance of the securities onto its platform and its and TD Ameritrade's maintenance of those securities on that platform required not even the semblance of due diligence, Plaintiff Walker Trust and other members of the TD Ameritrade Subclass purchased the securities with further material aid and participation by TD Ameritrade in effectuating the transactions.

### C.   TD Waterhouse Stretches to Help Alleca's Scheme Grow

53.    During 2004 and 2005, Summit Wealth rapidly expanded organically and through acquisitions of other registered investment advisers.  By May of 2005 – shortly after the Asset Class Fund was created and incorporated into TD Waterhouse's platform – Summit Wealth had increased its assets under management six-fold since its purchase by Alleca in January 2004, growing from approximately $40 to $260 million in assets under management in less than 18 months.  This fact helps explain how valuable Summit Wealth had become to TD Waterhouse as well as TD Waterhouse's stiffening resolve to keep Alleca happy.

54.    The beginning of 2004 also marked the launch of increased marketing efforts by TD Waterhouse to capture greater U.S. market share in the adviser-

custody sector.  At the company's annual national conference in early February 2004 in Orlando, TD Waterhouse USA's chief executive officer, Frank J. Petrilli, addressed this effort before a crowd of 1,100 attendees.  He announced that the heads of TD Bank Financial Group in Toronto had redoubled their interest in the company's U.S. brokerage operations, including TD Waterhouse's adviser custody unit.  He further assured that he had given J. Thomas Bradley Jr., president of TD Waterhouse Institutional Services of New York,[2] "carte blanche" to spend freely to build the company's platform for financial advisers.  Thereafter, Mr. Bradley also made it clear that the conference was all about gathering adviser assets. Reportedly, TD Waterhouse put on a good show and had even better parties.  Not only that, TD Waterhouse picked up the advisers' travel costs (even those coming from across the country) to ensure they attended the event.  As one attendee noted, that fact differed from how Schwab handled similar marketing efforts at that time.

55.    In September 2004, it became apparent that the combination of TD Waterhouse's aggressive marketing efforts and lack of internal controls had caused

---

[2] "TD Waterhouse Institutional Services" appeared at the top and throughout account applications, periodic statements, and other communications from TD Waterhouse to Plaintiff Kissel and other members of the TD Ameritrade Subclass. According to those documents, TD Waterhouse Institutional Services was a "division of TD Waterhouse Investor Services, Inc. Member NYSE/SIPC."

the brokerage to cross the line.  On September 21, 2004, the SEC announced that it had settled civil charges against TD Waterhouse for its misconduct four years prior.  As part of the settled civil charges, the SEC found that (1) TD Waterhouse had given cash compensation to investment advisers to direct their clients' business to the brokerage; (2) had thereby created potential conflicts of interest between the advisers and their clients that required full disclosure in the advisers' Forms ADV and that "[e]ach of the Advisers' failure to adequately disclose the potential conflicts" violated federal law; (3) that TD Waterhouse knew it was creating a potential conflict of interest between the adviser and its clients that required disclosure and that TD Waterhouse even had written procedures to ensure the advisers' proper disclosure; and (4) that TD Waterhouse then "failed to follow these procedures in that it did not review all of the Forms ADV of the Advisers to 'ensure' that the payments had been adequately disclosed to the Advisers' clients and in the Advisers' Form ADV."

56.    Accordingly, the SEC found that "as a result of the conduct described above, [TD Waterhouse] willfully induced and was a cause of [the investment advisers'] violations of Sections 206(2) and 207" of the Investment Advisers Act of 1940 (the "Advisers Act").  As a result, the SEC censured TD Waterhouse,

ordered it to "cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 207 of the Advisers Act," and fined it $2 million.  In response, TD Waterhouse issued a statement expressing "regret that [its] oversight of these investment advisers' disclosures was not consistent with [its] own written policies" but ensuring that TD Waterhouse "has enhanced [its] internal controls" in response to these violations.

57.    Not long after, TD Waterhouse prominently featured Alleca in its investment-adviser marketing.  In or about May 2005, TD Waterhouse featured Alleca in a brochure titled:

# GROWING ADVISORS NEED
# A CUSTODIAN WHO CAN
# STRETCH
# TO HELP MEET THEIR NEEDS.

– followed by the familiar "TD" brand and division designation, "TD Waterhouse Institutional Services," in the bottom right corner of the brochure's cover.

58.    The brochure's next page reads, "WE STRETCH so you can expand," and then, a full-page professional photograph of Alleca appears next to a text box

with the heading "FLEXIBLE SERVICE."   Under that heading, it lists Alleca, Summit Wealth, its then-current $260 million AUM (assets under management), and a statement: "We believe providing great customer support means more than being polite.  It means understanding your needs and your business."

59.    As TD Ameritrade had hoped, Alleca and Summit Wealth expanded rapidly.  By May 2005, Alleca was one of TD Waterhouse's largest registered investment advisers in terms of assets under management.  By that point, Alleca had also violated Georgia and federal securities laws with TD Waterhouse's material aid and participation in unlawful sales of securities to Plaintiff Kissel and other members of the TD Ameritrade Subclass.  TD Waterhouse's assistance continued with each periodic statement it issued, systematically breaching its duties to clients on a regular basis.  But as promised, when Alleca expanded, TD Waterhouse stretched further to meet his needs.

60.    In October 2005, Alleca acquired Berger & Associates, a registered investment adviser with $50 million in assets under management.  With that acquisition, Alleca began his association with Schwab.  From that point forward, TD Ameritrade would maintain approximately 80 percent of Alleca's business with Schwab claiming the remainder. As Alleca acquired additional registered

32

investment advisers with pre-existing TD Ameritrade and Schwab custodian relationships, their competition for his business increased with the value of Summit Wealth's assets under management.

### D. TD Ameritrade – New Name, Same Material Aid and Willful Indifference to Alleca's Ponzi Scheme

61.  On January 24, 2006, Ameritrade Holding Corporation purchased what remained of the TD Waterhouse Group, Inc. after a reorganization divested it of everything but its United States retail securities brokerage business, which included TD Waterhouse Investor Services, Inc.  Thereafter, Ameritrade Holding Corporation added a "TD" to the front of its formal corporate name and redubbed TD Waterhouse Investor Services, Inc. as simply TD Ameritrade, Inc.  The latter remained a registered broker-dealer and retained its investor adviser clients, such as Summit Wealth.

62.  Around the same time, if not much earlier, TD Ameritrade received additional irrefutable evidence that Alleca and Summit Wealth were violating federal securities laws from changes in Summit Wealth's Form ADV.  Part I of this form is required to be filed with the SEC, and a corresponding Part II must be distributed to clients.  TD Ameritrade and Schwab probably received Part II, but

33

received Part I.  Accordingly, both had actual knowledge of the contents of these forms.

63.     In or about March 2004, TD Waterhouse (same company, different name) would have received the first Form ADV for Summit Wealth following Alleca's purchase of the underlying registered investment adviser.  As previously noted, Alleca formed the Summit Fund around this same time.  On the Form ADV for Summit Wealth dated March 23, 2004, Alleca checked the box next to Item 8D, which asked "Is the applicant or a related person a general partner in any partnership in which clients are solicited to invest?"

64.     Alleca checked "Yes" in 2004, and provided an explanation in an attachment as required.  In that attached explanation, Alleca noted the following about his involvement with the Summit Fund:

> When Registrant [Summit Wealth] believes it is in the best interest of the client, investments in interests in private investment partnerships and/or investment funds, including interests in the Registrant's affiliated fund, the [Summit Fund] (the "*Partnership*") will be recommended (but only to those who also meet the minimum eligibility requirements of these investments).

65.     At some point subsequent to this March 2004 disclosure, but no later than January 2006, Alleca stopped checking the box next to Item 8D, and he omitted any reference to the Summit Fund or any other fund at issue in this case.

34

From that point forward, he intentionally omitted this information because he knew it would trigger an SEC audit, even though doing so violated federal law.  Indeed, intentional misstatements or omissions in Forms ADV constitute federal criminal violations.  According to the SEC, Form ADV and amendments to it are a basic and vital part in the administration of the Advisers Act – indeed, "it is essential in the public interest that the information required by the application form be supplied completely and accurately."

66.    TD Ameritrade would have been provided with the March 2004 Form ADV, as well as any subsequent ones.  As noted, TD Ameritrade attended to the minutiae in these forms in order to provide an appearance of diligence.  Accordingly, TD Ameritrade had direct, actual knowledge that one of its registered investment advisers, Summit Wealth, was controlled by an individual violating criminal law, Alleca, as was the Summit Fund, which fact Alleca was hiding from the SEC.  TD Ameritrade was likewise aware of the significance of these forms.

67.    Despite this knowledge, TD Ameritrade continued to list Summit Fund securities on its platform, directly incorporate unverified values from Alleca for these securities into client account statements, and, within a matter of days even, further facilitate the unlawful sale of Summit Wealth securities by processing

35

another $150,000 purchase on behalf of Plaintiff Kissel on January 25, 2006. Thereafter, TD Ameritrade continued to list on its platform, report values, and process transactions in securities issued by Summit Fund and the Asset Class Fund, despite its knowledge of Alleca's violations of federal securities laws without disclosing that material fact to its clients. Then, TD Ameritrade added two more securities to its system associated with Summit Wealth and Alleca – Detroit Memorial and the Private Credit Fund – doing the exact same things with them.

68.    At some point in 2006, the Summit Fund completely unraveled internally and lost any remaining semblance to the fund-of-funds that purported to be, becoming instead a fund-of-one – Alleca's trading account. However, TD Ameritrade continued to list it on its platform, incorporate values received from Alleca into account statements, and otherwise facilitate additional sales of Summit Fund securities to its clients. Simultaneously, the Asset Class Fund's role as a conduit to pay Summit Fund redemptions became even more prominent. TD Ameritrade continued its conduct with respect to both funds.

69.    During this time period, after making deposits into the Asset Class Fund, Alleca would withdraw identical (or nearly identical) amounts to pay redemptions to investors in the Summit Fund, affording TD Ameritrade even more

36

notice of illegal conduct.   Unlike Plaintiffs and other members of the TD Ameritrade Subclass who had no other way to verify the value of their investments or uncover Alleca's scheme, TD Ameritrade was uniquely positioned to notice that the value of the new investments conspicuously matched the redemptions made to investors in the Summit Fund.

70.    TD Ameritrade's actions represent **willful misconduct and an entire want of care demonstrating conscious indifference to the consequences of its actions.**

71.    Put simply, because of the significant financial incentives to TD Ameritrade and undisclosed to its clients, it knowingly and willfully breached its duties to Plaintiffs and the Class by utterly failing to act with even a modicum of due diligence in connection with the verbal representations and single line emails provided by Alleca as to the value of assets subsequently reported to Plaintiffs and the other members of the Class.   Indeed, TD Ameritrade only terminated its relationship with Alleca for unrelated financial reasons rather than because of any misconduct on Alleca's part.

### E.    Detroit Memorial

72.    In the same manner as discussed above and despite TD Ameritrade's increasing knowledge of Alleca's unlawful conduct, TD Ameritrade listed a new security on its platform – Detroit Memorial promissory notes – and began further materially aiding and participating in the unlawful sale of these securities by Alleca, Morrow, Summit Wealth, and Detroit Memorial.  Over the course of nearly five years, from October 2007 until March 2012, TD Ameritrade materially aided and participated in the sale of $19 million in promissory notes by means of its participation in Alleca's scheme, in precisely the same manner as discussed above, as well as by misleading statements and material omissions in the Detroit Memorial PPM and other communications by Alleca, Summit Wealth, and Detroit Memorial.  Indeed, without TD Ameritrade's involvement, no market would have existed for these securities.

73.    From October 2007 to December 2007, TD Ameritrade materially aided and participated in the purchase of approximately $9.5 million worth of Detroit Memorial securities (promissory notes), acting on behalf of Plaintiffs Claxton, Sullivan, Walker, and Walker Trust, and approximately 95 other members of the TD Ameritrade Subclass.  These sales were made by TD Ameritrade's

acceptance of these securities onto its platform and commitment to incorporate them into client account statements, as well as misleading statements in the Detroit Memorial PPM that was drafted and distributed to investors by Alleca. These were all clear red flags as to these securities' illegality.

74.     Alleca made material misrepresentations and omissions to Plaintiffs and other members of the Class concerning Detroit Memorial, which purported to be in the business of operating cemeteries. In so doing, Alleca acted in concert with Morrow, the managing member of Detroit Memorial and his long time business associate with whom he co-founded Summit Capital Trading in 1998. Morrow was also listed as the managing member of the general partner in the Asset Class Fund, which had become a Ponzi scheme by the time the first Detroit Memorial promissory notes were issued.

75.     Alleca knowingly misrepresented and omitted material facts in the Detroit Memorial PPM that he drafted and distributed to each investor, among other communications. Most fundamentally, the Detroit Memorial PPM falsely represented that Detroit Memorial would own the real property and would manage cemeteries through an experienced team of senior management and over 150 employees. This was false because the Detroit Memorial PPM omitted the

material fact that Detroit Memorial would own a minority share of an entirely separate legal entity, Midwest Memorial, which would own and operate the cemeteries through its team of experienced employees.  The Detroit Memorial PPM further misrepresented that the notes would be secured by these real property interests, that Detroit Memorial had been funded by its principals and had assets, and that it was in the business of owning and managing cemeteries.  These statements were false in that they omitted the fact that such statements were only true as to a separate legal entity – Midwest Memorial – in which Detroit Memorial would not even own a controlling stake.

76.    Specifically, the Detroit Memorial PPM stated that the "Notes . . . will be secured by real property and equity interest in 28 Michigan cemeteries."  This statement was false and misleading by the omission of the material fact that the notes were never intended to be secured by Detroit Memorial's ownership of assets because such direct ownership was never contemplated and, as such, no security interest was ever contemplated to be perfected or recorded by Detroit Memorial.

77.    The Detroit Memorial PPM also misleadingly stated that "[i]ndependent of the amounts raised in this offering [Detroit Memorial] was funded by its principals.  Independent of the amounts raised in this offering,

[Detroit Memorial] will, after completing the purchase transaction, have equity in real property and cemeteries and other assets available to use to pay principal or interest on the Notes."  In fact, Detroit Memorial had no assets at all at the time of the offering and was merely a shell company that would become a minority shareholder in Midwest Memorial.  Moreover, the Detroit Memorial PPM did not disclose that another investor would have a preference to distributions from the cemetery operations contemplated by Midwest Memorial.

78.    The Detroit Memorial PPM further represented that "[t]he Company is in the business of owning and managing cemeteries."  Contrary to this statement, Detroit Memorial never intended to own or manage any cemeteries; rather, it was merely a holding company for a minority stake in a company that would invest in the cemeteries, Midwest Memorial, which was in the business of owning and managing cemeteries.  Similarly, the Detroit Memorial PPM was misleading in stating that "[t]he senior management team has . . . more than 150 dedicated employees."  Omitted from this statement is the material fact that Detroit Memorial had no employees, only Midwest Memorial did.

79.    The Detroit Memorial PPM also misleadingly stated that the "[t]he Company has recently purchased the assets of twenty-eight cemeteries located

41

throughout the state of Michigan."  In fact, no cemetery assets had been purchased by any entity affiliated with Detroit Memorial, and it was never intended for Detroit Memorial to ever purchase cemetery assets.  Rather, it was to be a minority shareholder in Midwest Memorial, which would purchase the cemeteries and associated assets.  The Detroit Memorial PPM also misrepresented that the proceeds from the notes would be used to acquire and manage cemeteries.  Instead, significant amounts of the proceeds were used to fund Morrow's personal equity interest in Detroit Memorial, which was used for high risk trading in securities and to pay interest owed to other Detroit Memorial note holders.

80.    Once it became apparent that it would take longer to close the cemetery purchase than initially expected, Morrow transferred the proceeds from the initial note sales to an investment account and authorized Alleca to trade with the funds.  Alleca lost more than $5 million of the note proceeds in risky, short term equity trading in early January 2008.  Morrow then demanded that Alleca make up the losses.

81.    Subsequently, TD Ameritrade further materially aided and participated in Alleca's sale of additional Detroit Memorial promissory notes between January 23, 2008 and September 16, 2009 pursuant to the means already

discussed above, including the same materially false Detroit Memorial PPM. Alleca, Morrow, Summit Wealth, and Detroit Memorial thereby brought in approximately $8.2 million in additional funding from Summit Wealth clients by means of TD Ameritrade's material assistance in the same manner discussed above.

82.    All but a few of these sales were in express violation of the terms of the Detroit Memorial PPM and subscription documents, which set a total maximum of $10 million  in promissory notes that could be issued pursuant to the Detroit Memorial PPM and subscription documents.  Because TD Ameritrade materially aided and participated in the sale of the vast majority, if not all, of the Detroit Memorial promissory notes to date, TD Ameritrade had to know that it was aiding and participating in the sale of securities by means of untrue statements and was otherwise assisting Alleca's and Morrow's fraudulent scheme.  Moreover, only Alleca, Morrow, and TD Ameritrade would have had access to information on the value of promissory notes issued and the fact that the total value exceeded the permitted value in the Detroit Memorial PPM and subscription documents in early 2008.

83.    Finally, TD Ameritrade also materially aided and participated in Alleca's sale of Detroit Memorial promissory notes in its 2012 issuance pursuant to the means discussed above, including the same materially false Detroit Memorial PPM.

84.    TD Ameritrade should have been particularly vigilant in its due diligence given that promissory notes are well-known in the industry as being favored by individuals who run Ponzi schemes.  This was especially so during the financial crisis when investors were skittish about investing in the stock market and frustrated by low interest rates.

85.    At the same time that TD Ameritrade was facilitating the sales of Detroit Memorial promissory notes, Schwab faced (and, ultimately, settled after the court denied two motions to dismiss and granted class certification over Schwab's objection) litigation in the District of South Carolina relating to promissory notes sold by Albert Parish as part of Parish's long-running and notorious Ponzi scheme relating to Parish Economics, LLC and various associated investment pools.  *See Brown et al. v. Charles Schwab & Co., Inc.*, No. 07-cv-03852-DCN, 2009 WL 4809426 (D.S.C. Dec. 9, 2009).

86.     As part of that settlement, the subclass of investors for whom Schwab had transferred out cash in exchange for a Parish promissory note (as opposed to accepting a transfer of a Parish security) recovered 100 percent of their losses, and Schwab paid class counsel's attorneys fees on top of that amount.   Shortly after being sued in that case, Schwab changed its alternative investments custody policy. As part of those policy changes, "[p]romissory notes will no longer be accepted," and "[e]xisting promissory notes will not be rolled over."   In a letter to clients shortly thereafter, a Schwab senior vice president explained that Schwab "made this change, which went into effect on February 1, 2008, in order to be consistent with industry practices regarding custody of alternative investments."   Not heeding the warnings presented by the Parish Ponzi scheme, TD Ameritrade's policies in this regard would remain inconsistent with industry practices.

### F.     The Credit Crisis and the Private Credit Fund

87.     In November 2008, Alleca established another Ponzi-like investment vehicle, the Private Credit Fund.   Soon thereafter, despite its experience with Al Parish and abundant red flags as to the capital needs of ailing Ponzi schemes brought on by the financial crisis, Schwab began materially aiding and participating in sales of Private Credit Fund securities, acting on behalf of and

serving as the broker-dealer for Plaintiff Ledbetter and other members of the Schwab/TD Subclass.  TD Ameritrade, ever eager to assist Alleca and Summit Wealth, did likewise by identical means to those already discussed above when it took over from Schwab.

88.     According to the Private Credit Fund's PPM, the fund's investment objective was to "maximize total return through capital appreciation and interest income from investments in public and private investment grade and non-investment grade debt securities, direct loans, Municipal Bonds, mortgages, collateralized mortgage obligations (CMO), collateralized debt obligations (CDO), asset backed securities (ABS), bridge lending, equity securities, warrants, options and convertible debt of companies, and other special situation investments."

89.     In reality, and unbeknownst to Plaintiffs and other members of the Class, the Private Credit Fund's true purpose was to pay redemptions to other investors, as well as to make dividend payments owed by the Private Credit Fund to its investors and interest payments due to investors in Detroit Memorial promissory notes.

90.     Schwab was on notice of Alleca's scheme given that it was uniquely positioned to notice any Ponzi scheme relating to Plaintiff Ledbetter and other

members of the Class's investments in the Private Credit Fund.  Moreover, Schwab was involved in litigation concerning the Parish Ponzi scheme in South Carolina.

91.    One staggering red flag that Schwab ignored was that the Private Credit Fund's PPM listed Alleca as the fund's manager and also as the owner of Summit Wealth.  On Summit Wealth's Forms ADV for December 9, 2008, January 30, 2009, and March 31, 2009 (the Annual Amendment), however, Alleca answered "No" to the question, "Are you or any related person a general partner in an investment-related limited partnership or manager of investment-related limited liability company, or do you advise any other 'private fund' as defined under SEC rule 203(b)(3)-1?"

92.    TD Ameritrade was likewise on notice of Alleca's scheme given this disclosure in the Private Credit Fund PPM.  Summit Wealth's Form ADV likewise put TD Ameritrade on notice (or should have put TD Ameritrade on notice) of Alleca and Summit Wealth's malfeasance.

### G.    Defendants Belatedly Exercise Their Control Over Alleca

93.    Throughout the relevant period, Defendants exercised control over Alleca, Summit Wealth, Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial.

94.    As one of TD Waterhouse's star registered investment advisers who attended marketing photo shoots and appeared in its brochures, TD Waterhouse provided Alleca with national exposure and credibility, leaving him well positioned to draw in more investors (and, in turn, boost TD Waterhouse's profits). Such arrangements seem to have worked out well for TD Ameritrade as well.  By the end of the June 2011, TD Ameritrade had grown the assets in custody of its registered investment advisers to about $133 billion, up from $100 billion a year earlier.

95.    Despite the red flags of illegal conduct, Alleca remained a key figure among TD Ameritrade's registered investment advisers, and served on (1) TD Ameritrade's elite Institutional Advisor Panel, a panel of twenty-four independent investment advisers who advised TD Ameritrade Institutional on issues relevant to the independent adviser community; and (2) the TD Ameritrade Institutional Operations Panel, a group of twenty-four independent investment advisers who advised on TD Ameritrade's service, technology, and products, further demonstrating his and Summit Wealth's importance to TD Waterhouse.

96.    Rather than directly and indirectly exerting their ability to control Alleca and Summit Wealth to stem their illegal conduct, TD Ameritrade and

Schwab continued to court and promote both of them.  In this regard, not only did TD Ameritrade participate in Plaintiffs' and the Class's investments and provide material support to Alleca's scheme, but TD Ameritrade also prominently featured Alleca in marketing materials to investors, adding a veneer of reliability and respectability to Alleca.  TD Ameritrade did so because of the enormous fees it earned from Alleca's and Summit Wealth's rapidly expanding business.

97.    For its part, TD Ameritrade even featured Alleca in a video to market its services to registered investment advisers.  In October 2011, Alleca appeared for a promotional video in Los Angeles which was designed to help market TD Ameritrade's new public website.  The video briefing stated that the video's objective was to "demonstrate the experience of advisers in becoming/being RIAs and their relationship with custodian to manage their business needs."  The intended effect of the "dynamic web video content" was to "present relatable testimonial perspectives to prospects visiting [TD Ameritrade's] website."

98.    Schwab only refused to report values on client statements for the Private Credit Fund in mid-2009.  Thereafter, Alleca cancelled Summit Wealth's relationship with Schwab, and TD Ameritrade willingly took over as broker-dealer custodian for a large number of former Schwab clients with total assets under

management of $60 million.  In or about September 2009, TD Ameritrade Clearing Inc. sent Schwab confirmations of re-registration for the Private Credit Fund, thereby transferring custodial responsibility from Schwab to TD Ameritrade.  By this time, however, Plaintiff Ledbetter and other members of the Schwab/TD Subclass had purchased approximately $1.2 million of Private Credit Fund securities.

99.   It was not until August 8, 2012, however, that TD Ameritrade terminated its relationship with Alleca (for reasons unrelated to the misconduct alleged herein), effective 60 days from the date of the correspondence.  The letter stated, in relevant part:

> This letter is to inform you that TD Ameritrade Institutional has decided to terminate our relationship with your firm effective 60 days from the date of this correspondence.  As a result, your Advisor Master Account Application is being terminated as of the aforementioned effective date, along with any other Agreements or Addenda that you may have entered into with TD Ameritrade Institutional, including but not limited to your Additional Services Addendum.  In addition, the following actions may take place on or after October 8, 2012:
>
> •   Limited Power of Attorney (LPOA) will be revoked on all client accounts
>
> •   Advisory firm login(s) will be disabled
>
> •   The block trading account will be closed

- The sundry account will be restricted to liquidating transactions only

- Advisor personal accounts may be restricted to liquidating transactions only.

Also, please note the following actions may be taken immediately:

- LPOA will be revoked on all client accounts under rep codes where you are listed as the primary contact

- Your personal logins to client accounts will be disabled

- No new accounts may be opened on the TD Ameritrade Institutional platform

- TD Ameritrade will not process any "off-cycle" or deferred management fees

100.   Schwab had the ability to stop Alleca's operations far earlier than October 2009, and TD Ameritrade had the ability to stop them far earlier than August-October 2012 by, among other things, canceling his access to Plaintiffs' and the Class members' funds, revoking power of attorney rights, and disabling his log-ins to accounts.   Defendants also had the ability to limit the types of transactions Alleca could enter into.

101.   For example, TD Ameritrade's control over Alleca is demonstrated by a September 17, 2012 email entitled "Asset Class Diversified" from a risk analyst at TD Ameritrade Clearing, Inc.   In the e-mail, TD Ameritrade requested that

Alleca complete its standard NSA [Non-Standard Asset] Custody Agreement and return the offering memorandum, subscription agreement, and most recent financial statement for the Asset Class Fund. The e-mail also noted that TD Ameritrade had not received client account statements since 2010. Even at this late stage, however, TD Ameritrade did not make Plaintiffs and members of the Class aware of the fact that they had utterly failed to implement even the most basic internal controls or exercise even a modicum of due diligence in exercising its control over Alleca.

### H.   Defendants' Further Breach of Fiduciary, Contractual, and Ordinary Duties to Plaintiffs and the Class

102.   Defendants owed duties to Plaintiffs and other members of the Class by contractually agreeing to serve as their broker-dealer and to provide associated services to them. In so doing, they provided Alleca with power of attorney over client accounts, personal log-ins to client accounts, an adviser master account, and processed and disbursed management fees. As such, they went far beyond acting as mere clearing brokers and exercised control over Alleca. Defendants assumed duties and obligations to transact in, hold, and safeguard the Plaintiffs' and the Class's funds and securities, execute instructions, settle transactions, and to accurately report and account for transactions and holdings. In reporting and

accounting for transactions and holdings, Defendants had an obligation to determine the true value of Plaintiffs' and the Class's investments.

103. In connection with these obligations, Defendants sent account statements to Plaintiffs and other members of the Class that purportedly represented the value of their relevant securities.  In most instances, however, these reported "valuations" were based solely on Alleca's imagination and were wholly unverified by Defendants.

104. If Defendants had undertaken even a modicum of due diligence or implemented any form of internal controls to verify the value of these assets, they would have determined that they were not worth what Alleca told them and Plaintiffs and the Class would have terminated their relationship with Alleca and his investment vehicles before their losses were fully realized.

## V.   CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of all those who held retirement or other brokerage accounts with Schwab and/or TD Ameritrade and invested in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and/or Detroit Memorial through broker-dealer custodian services provided by Schwab (the "Schwab/TD Subclass")

and/or TD Ameritrade (the "TD Ameritrade Subclass").  Excluded from the Class are Defendants, Alleca, Morrow, and the officers and directors of Defendants; members of the immediate family of any excluded individual; and the legal representatives, heirs, successors or assigns and any entity in which Defendants, Alleca, or Morrow have or had a controlling interest.

106.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Members of the Class may be identified from records maintained by Defendants and informed of the pendency of the action by mail, using the form of notice similar to that customarily used in securities class actions.

107.  Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of state and federal laws and breaches of fiduciary, contractual, and ordinary duties asserted herein.

108. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities-related litigation.

109. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the investments at issue in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial are "securities";

b. Whether Alleca, in connection with the sale of such securities, omitted to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading;

c. Whether Defendants materially aided/participated in Alleca's sales of such securities;

d. Whether Defendants satisfy their burden of proof that they did not know and, in the exercise of reasonable care, could not have known of the existence of facts by reason of which Alleca's

liability is alleged to exist with regard to the sale of non-exempt securities;

e.    Whether the securities at issue were registered;

f.    Whether the securities at issue were exempt from registration;

g.    Whether Defendants materially aided in the sale of unregistered securities;

h.    Whether Defendants had the ability to directly or indirectly control Alleca;

i.    Whether Defendants owed legal, fiduciary, contractual, and ordinary duties to Plaintiffs and other members of the Class;

j.    Whether Defendants breached their duties to Plaintiffs and other members of the Class;

k.    Whether Plaintiffs and the Class are entitled to punitive damages.

110.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

**(Materially Aiding/Participating in the
Sale of Securities by Means of Misleading Statements and
Material Omissions in Violation of the Georgia Securities Act of 1973)**

111.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

112.   Between approximately January 1, 2004 and June 30, 2009, Alleca, in connection with the purchase and sale of securities described herein, sold securities in violation of the then-current Official Code of Georgia Annotated, Section 10-5-12, with respect to the purchases of securities by members of the Class by omitting to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

113.   Defendants materially aided these violations in the following respects:

a.      Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered

investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated state and federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.      Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.      Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.      Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.      Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.      Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.      Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.      Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.      Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and

59

delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.     Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities marketed were legitimate.

114.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the then-current Official Code of Georgia Annotated, Section 10-5-12.

115.   Defendants are therefore liable to Plaintiffs and the Class for damages allowable under the Georgia Securities Act of 1973, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT II

**(Control Person Liability for Sale of Securities
by Means of Misleading Statements and Material
Omissions in Violation of the Georgia Securities Act of 1973)**

116.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

117.   Between approximately January 1, 2004 and June 30, 2009, Alleca in connection with the purchase and sale of securities described herein, sold securities in violation of the Official Code of Georgia Annotated, Section 10-5-12 by omitting to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

118.   Defendants had the ability to control Alleca and other persons liable for the violations of the then-official Official Code of Georgia Annotated, Section 10-5-12.

119.   Defendants actually participated in and exercised control over the operations of Alleca and Summit Wealth with respect to investments made by Plaintiffs and the Class and had the ability to control the specific transactions upon which the primary violations are predicated upon on one or more of the following respects:

a.     Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.     Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.     Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.      Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.      Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.      Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.      Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.    Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.    Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.    Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

120.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the then-current Official Code of Georgia Annotated, Section 10-5-12.

121.   Defendants are therefore liable to Plaintiffs and the Class for damages allowable under the Georgia Securities Act of 1973, including actual damages, prejudgment interest, costs and attorneys' fees.

## COUNT III

### (Materially Aiding/Participating in the Sale of Securities by Means of Misleading Statements and Material Omissions in Violation of the Georgia Uniform Securities Act)

122.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

123.   Between July 1, 2009 and the present, Alleca, in connection with the purchase and sale of securities described herein, sold securities in violation of the Official Code of Georgia Annotated, Section 10-5-50, with respect to the purchases of securities by members of the Class by omitting to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

124.   Defendants materially aided these violations in the following respects:

    a.   Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly

65

where Defendants had actual knowledge that the Forms ADVF for Alleca and Summit Wealth violated state and federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.  Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.  Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.  Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.    Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.    Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.    Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.    Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.    Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and

delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.   Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities marketed were legitimate.

125.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Official Code of Georgia Annotated, Section 10-5-50.

126.   Defendants are therefore liable to Plaintiffs and the Class for damages allowable under Official Code of Georgia Annotated, Section 10-5-58, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT IV

**(Control Person Liability for Sale of Securities
by Means of Misleading Statements and Material
Omissions in Violation of the Georgia Uniform Securities Act)**

127.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

128.   Between July 1, 2009 and the present, Alleca in connection with the purchase and sale of securities described herein, sold securities in violation of the Official Code of Georgia Annotated, Section 10-5-50 by omitting to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

129.   Defendants had the ability to control Alleca and other persons liable for the violations of the Official Code of Georgia Annotated, Section 10-5-50.

130.   Defendants actually participated in and exercised control over the operations of Alleca and Summit Wealth with respect to investments made by Plaintiffs and the Class and had the ability to control the specific transactions upon which the primary violations are predicated upon on one or more of the following respects:

a.      Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.      Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.      Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.      Failing to disclose to Plaintiffs and other members of the Class
that Alleca's and Summit Wealth's Forms ADV omitted
material information;

e.      Providing Alleca and Summit Wealth with a master account for
all account holders so that Alleca could control the funds of
Plaintiffs and the Class;

f.      Accepting the Summit Fund (TD Ameritrade), the Asset Class
Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade
and Schwab), and Detroit Memorial (TD Ameritrade) on their
securities platforms and marketing each fund to their clients;

g.      Processing Plaintiffs' and other members of the Class'
transactions in the Summit Fund (TD Ameritrade), the Asset
Class Fund (TD Ameritrade), the Private Credit Fund (TD
Ameritrade and Schwab), and Detroit Memorial (TD
Ameritrade) through wire transfers from Plaintiffs and other
members of the Class to Summit Wealth and/or Alleca;

h.   Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.   Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.   Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

131.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Official Code of Georgia Annotated, Section 10-5-50.

132.   Defendants are therefore jointly and severally liable as control persons to Plaintiffs and the Class for damages allowable under Official Code of Georgia

Annotated, Section 10-5-58, including actual damages, prejudgment interest, costs and attorneys' fees.

## COUNT V

### (Materially Aiding/Participating in Sales of Unregistered Securities In Violation of the Georgia Securities Act of 1973)

133.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

134.   Between approximately January 1, 2004 and June 30, 2009, Defendants materially aided the sale of unregistered securities to Plaintiffs and the Class in violation of the Georgia Securities Act of 1973 in one or more of the following respects:

a.   Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.      Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.      Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.      Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.      Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.      Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

74

g.     Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.     Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.     Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.     Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with

Defendants, thereby implying that the securities both marketed were legitimate.

135.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Georgia Securities Act of 1973.

136.   Defendants are therefore liable to Plaintiffs and the Class for damages allowable under the Georgia Securities Act of 1973, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT VI

### (Control Person Liability for Sale of Unregistered Securities in Violation of the Georgia Securities Act of 1973)

137.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

138.   Between approximately January 1, 2004 and June 30, 2009, the investments in the various securities managed by Alleca were securities as the term is defined in the Georgia Securities Act of 1973.

139.   The sales of such securities to Plaintiffs and the Class were in violation of the Georgia Securities Act of 1973.

140.   Defendants had the ability to control Alleca and other persons liable for violating the Georgia Securities Act of 1973.

76

141.   Defendants actually participated in and exercised control over the operations of Alleca and Summit Wealth and had the ability to control the specific transactions upon which the primary violations are predicated in one or more of the following respects:

a.   Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.   Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.   Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative,

77

respectively, properly registered with the SEC via their respective Forms ADV;

d.     Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.     Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.     Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.     Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.    Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.    Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.    Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

142.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Georgia Securities Act of 1973.

143.   Defendants are therefore jointly and severally liable as control persons to Plaintiffs and the Class for damages allowable under the Georgia Securities Act of 1973, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT VII

**(Materially Aiding/Participating in Sales of Unregistered
Securities In Violation of the Georgia Uniform Securities Act)**

144.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

145.   Between July 1, 2009 and the present, Defendants materially aided the sale of unregistered securities to Plaintiffs and the Class in violation of the Official Code of Georgia Annotated, Section 10-5-20 in one or more of the following respects:

 a. Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

 b. Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the

Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.   Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d.   Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.   Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.   Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.   Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset

Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.   Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.   Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.   Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

146.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Georgia Uniform Securities Act.

147.   Defendants are therefore liable to Plaintiffs and the Class for damages allowable under Official Code of Georgia Annotated, Section 10-5-58, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT VIII

### (Control Person Liability for Sale of Unregistered Securities in Violation of the Georgia Uniform Securities Act)

148.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

149.   Between July 1, 2009 and the present, the investments in the various securities managed by Alleca were securities as the term is defined in the Georgia Uniform Securities Act.

150.   The sales of such securities to Plaintiffs and the Class were in violation of the Official Code of Georgia Annotated, Section 10-5-20.

151.   Defendants had the ability to control persons liable for violating Official Code of Georgia Annotated, Section 10-5-20 with respect to investments of Plaintiffs' and the Class's investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial.

152.   Defendants TD Ameritrade and Schwab actually participated in and exercised control over the operations of Alleca and Summit Wealth and had the ability to control the specific transactions upon which the primary violations are predicated in one or more of the following respects:

a.   Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b.   Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c.   Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative,

84

respectively, properly registered with the SEC via their respective Forms ADV;

d.    Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e.    Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f.    Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.    Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

     h.     Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

     i.     Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

     j.     Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

153.   Defendants either knew, or through the exercise of reasonable care should have known, of Alleca's violations of the Georgia Uniform Securities Act.

154.   Defendants are therefore jointly and severally liable as control persons to Plaintiffs and the Class for damages allowable under Official Code of Georgia

Annotated, Section 10-5-58, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT IX

### (Control Person Liability for Violation of Federal Securities Law)

155.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

156.   Through the conduct alleged herein, Alleca and Summit Wealth violated the U.S. securities laws, namely Section 10(b) of the Securities Exchange Act of 1934.

157.   Defendants had the ability to and did control persons liable for violating the Securities Exchange Act of 1934 (Alleca and Summit Wealth) in one of more of the following respects:

a.   Accepting and maintaining on their platforms Summit Wealth and Alleca as a registered investment adviser and registered investment adviser representative, respectively, particularly where Defendants had actual knowledge that the Forms ADV for Alleca and Summit Wealth violated federal securities laws by not disclosing Alleca's interest in and control over the

Summit Fund, the Asset Class Fund, and the Private Credit Fund;

b. Agreeing to serve as broker-dealers for investment and other accounts with respect to investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial;

c. Holding out Summit Wealth and Alleca as a validly registered investment adviser and investment adviser representative, respectively, properly registered with the SEC via their respective Forms ADV;

d. Failing to disclose to Plaintiffs and other members of the Class that Alleca's and Summit Wealth's Forms ADV omitted material information;

e. Providing Alleca and Summit Wealth with a master account for all account holders so that Alleca could control the funds of Plaintiffs and the Class;

f. Accepting the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade

and Schwab), and Detroit Memorial (TD Ameritrade) on their securities platforms and marketing each fund to their clients;

g.   Processing Plaintiffs' and other members of the Class' transactions in the Summit Fund (TD Ameritrade), the Asset Class Fund (TD Ameritrade), the Private Credit Fund (TD Ameritrade and Schwab), and Detroit Memorial (TD Ameritrade) through wire transfers from Plaintiffs and other members of the Class to Summit Wealth and/or Alleca;

h.   Permitting Alleca to use Schwab and TD Ameritrade forms in connection with Plaintiffs' and the Class's investments so that Alleca could access and misuse their funds;

i.   Collecting false account values from Alleca, incorporating that information into Defendants' account statements, and delivering those account statements to Plaintiffs and the Class containing the false values, thereby misrepresenting the integrity of the investments in what was, in reality, a Ponzi scheme; and

j.   Otherwise allowing Alleca to represent to the investing public the existence of his and Summit Wealth's relationship with Defendants, thereby implying that the securities both marketed were legitimate.

158.   Defendants are therefore jointly and severally liable as control persons to the Plaintiffs and the Class pursuant to Section 20(a) of the Securities Exchange Act of 1934.

## COUNT X

### (Negligent Misrepresentation)

159.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

160.   Defendants, through the provision of periodic account statements to Plaintiffs and the Class, misrepresented the integrity and value of Plaintiffs' and the Class's investments in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial.  These account statements were Plaintiffs' and the Class's primary means for determining the integrity of their investments. These account statements served as direct communications to Plaintiffs and the Class.

161. Defendants either knew, or through the exercise of reasonable care should have known, that the values reported in the account statements represented a total fiction.

162. If Plaintiffs and the Class had known the truth about investing in the Summit Fund, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial, they would not have done so.

163. As a result, Defendants are therefore liable to Plaintiffs and the Class, including actual damages, prejudgment interest, costs, and attorneys' fees.

## COUNT XI

### (Breach of Contract)

164. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

165. The broker-dealer custodian contracts between Schwab and Plaintiff Ledbetter and members of the Schwab/TD Ameritrade Subclass and the broker-deal contracts between TD Ameritrade and Plaintiffs Curry, Claxton, Sullivan, Walker, the Walker Trust, Kissel, and members of the TD Ameritrade Subclass were valid and enforceable contracts.

166.   Plaintiffs and the Class fully performed their obligations under the broker-dealer custodian contracts.

167.   Defendants breached the broker-dealer contracts by serving as a broker-dealer for Alleca and Summit Wealth despite the actual knowledge that both were operating with materially false Forms ADV on file with the SEC.

168.   Defendants further breached the broker-dealer custodian contracts by their grossly negligent and willful disregard of red flags alerting them to Alleca's misconduct and their promotion of Alleca, material aid to his scheme, and processing transactions in the securities at issue.

169.   As a direct and proximate result of the foregoing, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

### COUNT XII

### (Breach of Fiduciary Duty)

170.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

171.   As broker-dealer custodians, Defendants owed Plaintiffs and other members of the Class a fiduciary duty.

172.   By putting their self-interest in receiving an array of fees from Plaintiffs' and the Class's investments in Summit Wealth, the Asset Class Fund, the Private Credit Fund, and Detroit Memorial ahead of Plaintiffs' and the Class's interests, Defendants breached their fiduciary duties to Plaintiffs and the Class.

173.   As a direct and proximate result of the foregoing, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

## COUNT XIII

### (Aiding and Abetting Breach of Fiduciary Duty)

174.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

175.   Defendants knew that Summit Wealth served as a registered investment adviser and Alleca served as an investment adviser to Plaintiffs and other members of the Class and that each therefore owed Plaintiffs and the Class fiduciary duties.

176.   Summit Wealth and Alleca breached their fiduciary duties to Plaintiffs and the Class by, among other things, unlawfully selling them securities as part of a Ponzi scheme.

177.   Defendants knew that Summit Wealth and Alleca were breaching their fiduciary duties to Plaintiffs and the Class and had actual knowledge that the Forms ADV that they submitted to the SEC were materially false.

178.   Defendants aided and abetted Alleca by willfully disregarding this fact and materially aiding and participating in disbursing Plaintiffs' and the Class's investments and failing to undertake any independent verification of the purported integrity of Plaintiffs' and the Class's investments.

179.   The foregoing breaches were the direct and proximate cause of damages to Plaintiffs and the Class.

180.   As a direct and proximate result of the above, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT XIV

### (Gross Negligence)

181.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

182.   Defendants owed Plaintiffs and the other members of the Class a duty of care as their broker-dealer custodians.

94

183.   Defendants breached their duties by their grossly negligent and/or willful disregard of glaring red flags, including, among other things, accepting Alleca's valuations of assets without verification and through servicing an investment adviser (Alleca) and a registered investment adviser (Summit Wealth) despite their knowledge that both had violated state and federal law by filing materially false Forms ADV with the SEC.

184.   The foregoing breaches were the direct and proximate cause of damages to Plaintiffs and the Class.

185.   As a direct and proximate result of the foregoing, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT XV

## (Unjust Enrichment)

186.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

187.   As broker-dealers, Defendants collected an array of fees such as trading commissions, account fees, custody fees, fees paid by mutual funds, money market fees, 12b-1 fees from mutual funds, unit investment trusts, and exchange-traded funds by serving as broker-dealer custodians to Plaintiffs and the Class

despite their actual knowledge that Alleca's and Summit Wealth's Forms ADV were materially false and by their willful disregard of red flags alerting them to the fact that Alleca was running a Ponzi scheme.

188.   It would be against fundamental principles of equity, fairness, and justice to allow Defendants to retain any fees associated with Plaintiffs' and the Class's use of Defendants as broker-dealer custodians.

## COUNT XVI

### (Punitive Damages)

189.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

190.   The conduct of Defendants, as set forth herein above, showed willful misconduct, malice, fraud, wantonness, oppression or entire want of care which would raise the presumption of conscious indifference to consequences. Accordingly, punitive damages should be imposed against each Defendant pursuant to Section 51-12-5.1 of the Official Code of Georgia Annotated to punish and deter each Defendant from repeating or continuing such conduct.

## VI.   RELIEF REQUESTED

WHERFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

A.    Determining this action is a proper class action and certifying Plaintiffs as class representatives;

B.    Awarding compensatory damages against Defendants in favor of Plaintiffs and the Class for damages sustained as a result of Defendants' wrongdoing together with interest thereon;

C.    Awarding punitive damages against Defendants in favor of Plaintiffs and the Class for damages sustained as a result of Defendants' wrongdoing;

D.    Awarding prejudgment interest;

E.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including but not limited to disgorgement);

F.    Awarding Plaintiffs and the Class their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees; and

G.    Awarding Plaintiffs and the Class such other relief as this Court deems just, equitable and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all triable issues raised in this Complaint.

Dated:  May 6, 2014                    Respectfully submitted,


/s/ Kevin R. Dean
 Kevin R. Dean (Bar #214855)
 Badge Humphries
 Christopher F. Moriarty

 MOTLEY RICE LLC
 28 Bridgeside Boulevard
 Mt. Pleasant, South Carolina 29464
 843-216-9000 Telephone
 843-216-9450 Facsimile
 kdean@motleyrice.com
 bhumphries@motleyrice.com
 cmoriarty@motleyrice.com